788 F.2d 1288
 40 Fair Empl.Prac.Cas. 773,
40 Empl. Prac. Dec. P 36,146
Leslie T. ROGERS, Appellant,
v.
Paul MASEM, Superintendent of Schools of the Little Rock,
Arkansas, School District, and Members of the Board of
Education of the Little Rock, Arkansas School District,
Individually and in their Official Capacities, Appellees.
 No. 84-2425.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 12, 1985.
Decided Oct. 9, 1985.
As Modified on Denial of Rehearing
and Rehearing En Banc
April 4, 1986.
 
 John W. Walker, Little Rock, Ark., for appellant.
 G. Ross Smith and Susan Lutton, Little Rock, Ark., for appellees.
 Before ROSS and JOHN R. GIBSON, Circuit Judges, and COLLINSON,* Senior District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Leslie T. Rogers, an assistant principal who was discharged in 1982 from the Little Rock school system, appeals the judgment of the district court denying his claims of discrimination and due process violations arising out of his discharge. In June 1982, shortly before his contract was to expire, Rogers received a notice of termination from Superintendent of Schools Ed Kelly. The district court found that Kelly intended the notice to be one of nonrenewal and, hence, that Rogers was not entitled to the statutory procedures that apply when a teacher is terminated in Arkansas. We hold that the notice was, in fact, one of termination and, accordingly, reverse and remand for determination of appropriate relief.
 
 
 2
 Dr. Leslie T. Rogers, a black man with more than twenty-five years of experience in education, was employed by the Little Rock School District in 1979 as an evaluation specialist. After two years in that position, he was reassigned to the position of assistant principal at Henderson Junior High School under the supervision of Principal Marjorie Hubbard. His year at Henderson was a stormy one. The district court found that:
 
 
 3
 Dr. Rogers' period of employment at Henderson can be described as one of continuing conflict. * * * Although many of Dr. Rogers' confrontations involved Marjorie Hubbard, he also experienced difficulty with a football coach, teachers who were called upon to work with him, the representative of the Classroom Teachers' Association, bus drivers and the supervisor of transportation for the district.
 
 
 4
 Dr. Rogers complains that he was the victim of unfair treatment by Mrs. Hubbard and others while at Henderson. He claims that his problems with Mrs. Hubbard stemmed from the fact that she was insensitive to black children and treated blacks and poor whites differently from whites who enjoyed economic advantages.
 
 
 5
 * * *
 
 
 6
 * * *
 
 
 7
 After hearing the witnesses and reviewing the exhibits, the court is convinced that Dr. Rogers was unable to resolve his differences of opinion with Mrs. Hubbard and others without an unpleasant encounter. On several occasions, he ended a meeting with a flurry of heated words or a threat to call his attorney. While the court does not doubt Dr. Rogers' sincerity about his concern for the treatment of blacks and the poor, self-righteousness is no excuse for the abusive behavior and disruptive attitude displayed by Dr. Rogers on many occasions.
 
 
 8
 Rogers v. Masem, No. LR-C-82-485, slip op. at 2-3 (E.D.Ark. Oct. 4, 1984).
 
 
 9
 In April, Rogers was removed from Henderson by Superintendent of Schools Paul Masem and reassigned to the personnel department. In June, Superintendent Ed Kelly, who had replaced Masem earlier that month, wrote Rogers telling him that he was recommending his "termination" because of:
 
 
 10
 1) Your refusal to comply with and carry out certain tasks and duties assigned to you by your supervisor.
 
 
 11
 2) Specific acts of insubordination, including telling youngsters not to do certain things they were told to do by Mrs. Hubbard.
 
 
 12
 3) Your refusal to support certain policies and procedures of the school district.
 
 
 13
 4) Your harassment and intimidation of fellow employees through threats of legal action and threats to use a tape recorder in the performance of your duties.
 
 
 14
 At trial, Masem testified that, in light of the list of reasons given as well as the fact that ordinarily notices of nonrenewal were sent in March or April of the school year, he would regard the letter as one of termination and not of nonrenewal. Kelly, however, testified that when he wrote the letter he "had not learned at that time to make a clear distinction" between the terms. The district court accepted Kelly's explanations, stating that
 
 
 15
 for whatever legal significance it might have, [the court] believes that Dr. Kelly intended the letter as notice of nonrenewal and not a discharge letter. In fact, Dr. Rogers was not 'terminated' in the sense that he was discharged; he was simply not offered another contract.
 
 
 16
 Rogers, slip op. at 6.
 
 
 17
 Kelly's letter to Rogers was dated June 15, 1982. Rogers's contract expired June 18, 1982. In a letter dated July 12, 1982, Rogers's attorney requested a hearing before the Board of Directors of the school district. On July 13, 1982, at a special meeting the Board considered Kelly's recommendation. There was testimony that Board members had received documentation prepared by the district reproducing and outlining some of the letters and memos that had been written about incidents involving Rogers at Henderson. Principal Hubbard appeared before the Board and answered a few questions. Rogers was given no opportunity either to review the documentation or to appear before the Board. The Board voted not to renew Rogers's contract. After further action by Rogers's attorney, the school district offered Rogers an informal hearing on October 28, 1982. No formal presentation of evidence or cross-examination of witnesses was allowed, but Rogers did make his presentation under interrogation by his counsel. Following the hearing, the Board took no vote but simply allowed the earlier vote of nonrenewal to stand.
 
 
 18
 Rogers sued the Little Rock School District and its superintendent and school board members, claiming discrimination and violation of due process rights. In a bench trial, the district court, after determining that Rogers's "specific contentions about racial discrimination at Henderson [were] directed toward Mrs. Hubbard," found that
 
 
 19
 [t]he only evidence of discrimination by Mrs. Hubbard is conclusory statements by Dr. Rogers. There is no credible or persuasive evidence that Mr. Greenway [a white assistant principal at Henderson] was given preferential treatment by Mrs. Hubbard; that Mrs. Hubbard treated Dr. Rogers unfairly; or that Mrs. Hubbard improperly or unfairly documented incidents involving Dr. Rogers. To the contrary, Dr. Rogers was furnished copies of documentation of the incidents and responded in writing to most of them.
 
 
 20
 Perhaps the allegation of discriminatory treatment which has a semblance of substance revolves around Mrs. Hubbard's handling of a complaint by Dr. Rogers regarding the treatment of black children by a black bus driver. Apparently a black bus driver made racially derogatory remarks to some of the black children who were passengers on her bus. Dr. Rogers was critical of Mrs. Hubbard for not taking corrective action. Mrs. Hubbard did, however, arrange a meeting between Dr. Rogers and the district's supervisor of transportation. Unfortunately, the meeting ended with an argument between Dr. Rogers and the supervisor.
 
 
 21
 Rogers, slip op. at 3-4. Thus, it concluded that the nonrenewal of Rogers's contract was not the product of racial discrimination since he "failed to demonstrate that he was treated differently from similarly situated whites or that any adverse decisions toward him were arbitrary, capricious or racially motivated."[1] Id. at 10.
 
 
 22
 As to the due process claim, the court first concluded that no liberty interest was implicated, since Superintendent Kelly's dismissal letter was not made public. It then concluded Rogers was not deprived of a property interest in continued employment since he was a probationary employee and thus not protected by Arkansas's fair dismissal act for teachers and since de facto policies and practices created no such right. It expressed doubts that the Principals' Roundtable Agreement, a document spelling out, inter alia, procedures for dismissal of principals and entitling them to a hearing, applied to Rogers but concluded that, in any event, Rogers's posttermination hearing before the school board in October 1982 gave him whatever process was due under that document. It also noted that Rogers's "only other source of entitlement would rest upon the 'Classroom Teacher's Association Agreement' and there was substantial, if not actual, compliance with the terms of that agreement." Rogers, slip op. at 12. Thus, finding no violations of due process, the court entered judgment for the school district, from which Rogers now appeals.[2]
 
 I.
 
 23
 We first turn to Rogers's claim on appeal that he was dismissed because he exercised his first amendment rights. He argues one of the reasons he was fired was because he spoke out about the treatment of black students at Henderson. He points, for example, to evidence that in a memo prepared by Principal Hubbard she referred to Rogers's "excessive references to due process during disciplinary conferences." At trial, however, Rogers presented this and other similar evidence in support of his discrimination claim. His amended complaint did not raise the issue, and it was not the subject of consideration by the district court in its opinion. Our general rule is that we do not consider issues not raised in the courts below. For example, in Cato v. Collins, 539 F.2d 656, 662 (8th Cir.1976), a case involving an Arkansas black teacher whose contract was not renewed, we did not consider the constitutional issues raised on appeal because of "[t]he failure of appellant to assert such contentions in the District Court." As Rogers in his brief advances no reason for his tardiness in raising the issue, we shall adhere to our general rule and not consider it further.
 
 II.
 
 24
 Rogers also argues on appeal that he established that the school district considered his race in deciding to fire him and that, at the very least, he established a prima facie case of discrimination. As the case was fully tried on its merits before the district court, the question for us is whether Rogers proved "the ultimate question of discrimination vel non." United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983) (footnote omitted). In considering this question, we must give strong deference to the findings of fact of the district court. As the Supreme Court made clear in Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), last term, the clearly erroneous standard by which we review findings
 
 
 25
 does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. * * * If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 26
 Id. 105 S.Ct. at 1511-12 (citing United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) ). While we might have decided the case differently on this point, as there appears to be evidence of discrimination stemming from Rogers's defense of black children, we certainly cannot say there were not two permissible views of the evidence. Under Anderson, we cannot say that the district court clearly erred.
 
 III.
 
 27
 Finally, Rogers argues, as he did before the district court, that he was denied due process of law by the failure of the Little Rock School District to comply with Arkansas statutes, the provisions of the Principals' Roundtable Agreement, the provisions of the Classroom Teachers' Association Agreement, and the policies and practices of the school district. We turn first to his statutory claims.
 
 
 28
 As Rogers was a "teacher" as defined in the Teacher Fair Dismissal Act of 1979, Ark.Stat.Ann. Secs. 80-1264-1264.10 (1980) (repealed), the statute in effect at the time of his dismissal, he was entitled to the protections of that statute. Two distinctions made in the act are crucial to his case. First, probationary teachers (those with less than three successive years of employment in the school district) are distinguished from nonprobationary teachers (those with more than three years of employment). Second, since all teachers receive contracts only for one school year at a time, nonrenewal of a contract for the next school year is distinguished from termination of a contract. Rogers was entitled to automatic renewal unless he received the notice of nonrenewal. Ark.Stat.Ann. Secs. 80-1264.3 and 80-1304(b) (1980).
 
 
 29
 Since Rogers was in his third year of employment with the Little Rock School District he was a probationary teacher. As such, under section 80-1264.3, if his contract was not to be renewed, he was entitled to timely notice. If his contract was to be terminated, under section 80-1264.5 he was entitled to written notice containing "a statement of the grounds for * * * termination" and a statement "that a hearing before the board of directors is available * * * upon request." Unlike a nonprobationary teacher, he was not entitled to a hearing upon notice of nonrenewal. Id. Sec. 80-1264.8.
 
 
 30
 Since another section of the fair dismissal act seemed to suggest that probationary teachers did have a right to a hearing upon nonrenewal,[3] the issue was litigated, and the Arkansas Supreme Court specifically ruled that "the legislative intent was to create a right to a hearing by probationary teachers for termination but not for renewal." Allred v. Little Rock School District, 274 Ark. 414, 418, 625 S.W.2d 487, 489 (1981); see McElroy v. Jasper School District, 273 Ark. 143, 147, 617 S.W.2d 356, 358 (1981). At the time of Rogers's dismissal, then, it was quite clear that for probationary teachers the procedures attendant upon nonrenewal were separate and distinct from those attendant on termination.
 
 
 31
 As we have observed, the notice Rogers received from Superintendent Kelly stated that termination was being recommended. Further, the letter stated that its purpose was to provide Rogers "with the reasons for this recommendation [of termination] in accordance with Act 766 of 1979 [the fair dismissal act]." The Act required that a probationary teacher be given a statement of the grounds for termination but not for nonrenewal. Ark.Stat.Ann. Sec. 80-1264.5; see Nordin v. Hartman Public Schools, 274 Ark. 402, 406, 625 S.W.2d 483, 485 (1981) (probationary teacher not entitled to statements of reasons for nonrenewal); Maxwell v. Southside School District, 273 Ark. 89, 91, 618 S.W.2d 148, 149 (1981) (same); McElroy, 273 Ark. at 147, 617 S.W.2d at 358 (same). Thus, the inclusion of the reasons, which were made, as Kelly testified, on the advice of legal counsel, further indicates that the letter was, in fact, one of termination.[4] Since the letter did not state that a hearing was available to Rogers, and Rogers did not receive the timely hearing mandated by section 80-1264.8, on the facial appearance of the letter, Rogers did not receive the process he was due under the statute.
 
 
 32
 The district court only peripherally treated the issue of whether the notice was one of termination or nonrenewal. Instead it found "Dr. Rogers was not 'terminated' in the sense that he was discharged; he was simply not offered another contract," Rogers, slip op. at 6, indicating that this factual finding as to what occurred subsequent to the notice resolved the due process issues. In addition, it found that it believed "Dr. Kelly intended the letter as notice of nonrenewal and not a discharge letter." Id. at 6 (emphasis added). We see no need to disturb this finding but also see no finding in the district court's opinion that the letter was one of nonrenewal. In its brief to this court the school board also focuses exclusively on the intent of Superintendent Kelly. It cites us to no statute or case law stating that the plain language of the notice may be ignored or rewritten by a court.
 
 
 33
 We believe that the clear language of the notice cannot be ignored. While it is true that Arkansas generally required only substantial compliance with the provisions of the fair dismissal act, see, e.g., Maxwell v. Southside School District, 273 Ark. at 91, 618 S.W.2d at 149, here not even substantial, much less actual, compliance was achieved.[5] The distinction between termination and nonrenewal for probationary teachers was abundantly clear in Arkansas law at the time of Rogers's dismissal. Superintendent Kelly testified that when he sent the letter of notice to Rogers not only did he have advice of counsel but also that in dealing with Rogers he wanted
 
 
 34
 to make sure that we complied with all of the rules and regulations and the practices that we had to follow. So I asked the staff to make sure that we double checked, but I did not want to start off my employment--this was a very difficult time--in doing some things that were not legal. And I stressed the importance of making sure that we dealt with the issues as we were required to do so.
 
 
 35
 Superintendent Kelly's intention to comply with the procedures of the fair dismissal act was not enough. Compliance was also necessary. We believe, as a matter of law, that the notice of termination was, in fact, exactly that.
 
 
 36
 We must next consider what process, if any, Rogers was due in connection with his termination. Rogers has a constitutional right to some form of due process if the state, in terminating him, deprived him of a state-created property interest. Section 5 of the fair dismissal act states: "A teacher may be terminated during the term of any contract period for any cause which is not arbitrary, capricious, or discriminatory." Sec. 80-1264.4. While the statute does not specifically catalog the circumstances which can be considered "cause" for termination, cf. Cleveland Board of Education v. Loudermill, --- U.S. ----, 105 S.Ct. 1487, 1491 n. 4, 84 L.Ed.2d 494 (1985) (quoting Ohio Stat.Ann. Sec. 124.34 (1984)), it provides criteria which significantly guide decisionmakers' discretion. Parker v. Corrothers, 750 F.2d 653, 656 (8th Cir.1984). We are satisfied that it does establish in the appellant an interest in continued employment that is "more than a mere abstract need or desire * * * [or] unilateral expectation * * *." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).[6] We believe that the Act gives rise to a minimal but sufficient expectation in continued employment absent some rational, justifiable cause for termination. Moreover, the continued use of explicitly mandatory language in the procedural provisions of the fair dismissal act lends support to our conclusion. Cf. Hewitt v. Helms, 459 U.S. 460, 471-72, 103 S.Ct. 864, 871-72, 74 L.Ed.2d 675 (1983) (repeated use of mandatory language in procedures in connection with substantive predicates for adverse action creates protected interest); Parker, 750 F.2d at 656-57 (same). Arkansas has "gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures 'shall' * * * be employed * * *." Id. at 471, 103 S.Ct. at 871.[7] Additionally, the fact that the Superintendent, in attempting to comply with the statute, provided Rogers with four grounds for termination, suggests that the statute imposes some substantive limitation on the discretion to terminate. We conclude, therefore, that Rogers had a substantive property right of which he could not "be deprived except pursuant to constitutionally adequate procedures." Loudermill, 105 S.Ct. at 1493.[8]
 
 
 37
 Having concluded that the state deprived Rogers of a property interest, "the question remains what process was due." Loudermill, 105 S.Ct. at 1493 (quoting Morrisey v. Brewer, 408 U.S. 471, 491, 92 S.Ct. 2593, 2605, 33 L.Ed.2d 484 (1982)). The Supreme Court held in Loudermill that substantive property rights in employment require some minimal pre-termination hearing. Id. at 1495. Prior to termination, the School Board was obligated to provide Rogers at a minimum notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. Id. See also Stana v. School District, 775 F.2d 122, 128 (3d Cir.1985). Indeed, the Arkansas statutory procedures for termination require as much. Sec. 80-1264.4. Yet Rogers was not informed of his right to request such a hearing nor was such a hearing provided until more than four months after Rogers' employment ended. The due process required by Loudermill was thus denied and Rogers is entitled to recover in this claim.
 
 
 38
 Although we have serious doubts whether the procedures of the Principals' Roundtable Agreement and the Classroom Teachers' Association Agreement were complied with, in light of our holding we need not and do not reach these issues.
 
 
 39
 We reverse the judgment of the district court and remand for entry of judgment for Rogers and for calculation of damages and other appropriate relief in accordance with this opinion.
 
 
 
 *
 The HONORABLE WILLIAM R. COLLINSON, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation
 
 
 [1]
 In fact, concluded the court, Rogers had failed to make even a prima facie case, since "he did not prove he was qualified for the job as assistant principal." Rogers, slip op. at 9. The fact that he was replaced by a black male tended "to weaken any inference of racial discrimination." Id. at 10. Further, any such inference was "dispelled because the defendants proved a legitimate nondiscriminatory reason for the employment decision, i.e., that the plaintiff was not equipped by temperament or attitude for the job of assistant principal." Id
 
 
 [2]
 Rogers also alleged sex discrimination. The district court in its opinion simply stated that "[t]here is no evidence that Dr. Rogers was the victim of discrimination because of his sex." Rogers, slip op. at 9. This finding is not appealed by Rogers
 
 
 [3]
 Section 80-1264.9 referred to hearings for probationary teachers "with respect to the termination or nonrenewal of a teacher contract."
 
 
 [4]
 Further, the district court specifically determined that "[i]t has never been the policy or practice of the Little Rock School District to give probationary teachers (those in their first three years of employment) a statement of reasons * * * before nonrenewal of a contract." Rogers, slip op. at 7 (emphasis added). Thus, the court's own factual findings suggest the letter of termination was exactly what the letter said it was
 
 
 [5]
 In Fullerton v. Southside School District, 272 Ark. 288, 291, 613 S.W.2d 827, 829 (1981), the court implied that where "prejudice * * * [could be] shown to have resulted from any want of strict compliance," substantial compliance would not be enough. See Lee v. Big Flat Public Schools, 280 Ark. 377, 378, 658 S.W.2d 389, 390 (1983). Rogers, unlike Fullerton, received no hearing until several months after his discharge. Thus, if the notice was a notice of termination, there was prejudice to his position
 
 
 [6]
 We do not intend to imply that a statute analogously worded which affects an individual's liberty, such as in a prison context, would be sufficient to create a protectible liberty interest. Cf. Olim v. Wakinekona, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)
 
 
 [7]
 Section 5 of the fair dismissal act provides in relevant part:
 The superintendent shall notify the teacher of the termination recommendation. Such notice shall include a statement of the grounds for termination and shall be sent by registered or certified mail to the teacher at the teacher's residence address as reflected in the teacher's personnel file.
 Sec. 80-1264.4 (emphasis added).
 Section 9 of the act provides, in relevant part:
 A teacher who receives a notice of recommended termination * * * may file a written request with the school board of the district for a hearing. Such written request for a hearing shall be sent by certified or registered mail to the president of the school board, with a copy to the superintendent, or may be delivered in person to each of them by such teacher, within thirty (30) days after the written notice of proposed termination or nonrenewal is received by the teacher. Upon receipt of such request for a hearing, the board shall grant a hearing in accordance with the following provisions:
 (a) The hearing shall take place not less than five (5) nor more than ten (10) days after the written request therefor has been served on the board, except that the teacher and the board may, in writing, agree to a postponement of the hearing to a later date.
 (b) The hearing shall be private unless the board or the teacher shall request that the hearing be public.
 * * *
 Sec. 80-1264.8 (emphasis added).
 
 
 [8]
 Our decision in Cato v. Collins, 539 F.2d 656 (8th Cir.1976) does not hold to the contrary. Cato dealt with a purely non-renewal question. Its discussion is primarily directed to the continued contract system, established by the fair dismissal act, providing for automatic renewal. It simply does not deal with the issue of whether the statutory limitations on termination for cause create a property interest. Cato is fully consistent with the conclusion we here reach